# Exhibit 4

**CITATION:** NorthStar Earth & Space Inc. v. Spire Global Subsidiary, Inc., 2024 ONSC 5060
**COURT FILE NO.:** CV-24-00725366-00CL
**DATE:** 20240912

**SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)**

**RE:** NORTHSTAR EARTH & SPACE INC., Applicant

**AND:**

SPIRE GLOBAL SUBSIDIARY, INC., Respondent

**BEFORE:** KIMMEL J.

**COUNSEL:** *David Lederman, Julia Martschenko and Brittini Tee*, for the Applicant

*Todd Burke and Thomas Yates*, for the Respondent

**HEARD:** September 10, 2024

## ENDORSEMENT
### (MOTION FOR INTERLOCUTORY INJUNCTION)

**Background**

[1] NorthStar requires images from space to sell its services to its customers, for which NorthStar has patented specifications. Spire sells "Space Services" to its customers. It offers its customers the space infrastructure required to meet their needs. Due to recent performance issues with satellites that NorthStar contracted with Spire to manufacture, launch, and bring into commercial operation, NorthStar will be commencing an arbitration. In the meantime, it seeks an urgent injunction from the court to prevent the failed satellites from being deorbited or decommissioned and the downloading of images being terminated before its claims (including claims relating to the continued provision of images from the failed satellites pending delivery of replacement satellites) can be adjudicated.

[2] On March 1, 2022, NorthStar and Spire entered into a Constellation Services Framework Agreement (the "Agreement"). The Agreement provided that NorthStar would pay Spire to manufacture, launch, and operate satellites with low light imagers, from which NorthStar could obtain images compatible with its patented technology. NorthStar paid USD $14,460,423 for the initial manufacture and launch of 4 satellites (the "Block 1 Satellites").

[3] The Block 1 Satellites were successfully launched on January 31, 2024. One of them was subsequently lost in space. The other three are functioning but at levels and cannot produce transmittable images that meet the Service Level Agreement (the "SLA") attached as Schedule 5 to the Agreement. These service levels are required to meet the specifications for NorthStar's patented Concept of Operations ("CONOPS") that it uses to locate, identify and track potential threats from space.

[4]     This means that these three remaining Block 1 Satellites are in Block Failure under the Agreement (the "Failed Satellites"). Since Spire has not indicated that it has a plan to replace these Failed Satellites by December 31, 2024 (the timeframe specified under s. 12.1 of the Agreement), NorthStar intends to seek remedies for what it considers to be a breach of the Agreement in this regard.

[5]     The Agreement contains an arbitration clause (in s. 49) that NorthStar intends to invoke to commence an arbitration under the Rules of the International Chamber of Commerce (the "ICC"). NorthStar seeks an order from the court in the meantime, imposing interim measures pursuant to s. 5 of Ontario's *International Commercial Arbitration Act*, S.O. 2017, c.2. Sch.5 (the "*ICA*"). Specifically, NorthStar is asking the court, as an interim measure, to order Spire to abide by s. 12.2 of the Agreement. NorthStar maintains this contractual provision expressly obligates Spire to keep the three remaining Satellites in orbit and providing images, even if not to the complete contractual specifications under the SLA, until replacement satellites are manufactured, launched, and are put into commercial operation, or until the Arbitration is determined.

[6]     NorthStar argues that the interim measures are necessary to protect NorthStar from any permanent and irreparable harm until the ICC Tribunal can consider its claim arising from the alleged breaches of ss. 12.1 and 12.2 of the Agreement. In the Arbitration, NorthStar will continue to seek remedies attributable to any operational interruptions to the Satellites caused by Spire. NorthStar will also seek reimbursement of any amounts it is out of pocket during the interim period, but wants to ensure that the Failed Satellites are not de-orbited or de-commissioned while its position concerning Spire's obligation to keep them operating is determined by the ICC Tribunal.

[7]     Spire agrees that the court can decide the preliminary question regarding any interim measures to be imposed pursuant to s. 5 of the ICA in advance of the commencement of the Arbitration, but argues that NorthStar cannot satisfy any of the requirements for the injunction it seeks. The merits aspect of the injunction test turns on the interpretation of the Agreement. Spire argues NorthStar must, and has failed, to demonstrate a strong *prima facie* case regarding how to interpret NorthStar's contractual obligations pending the launch, check-out and commissioning of replacement satellites.

[8]     Spire also challenges the sufficiency of NorthStar's evidence about the potential for irreparable harm to its reputation and loss of customers which is unsubstantiated, and the sufficiency of NorthStar's undertaking as to damages which Spire asserts (based on confidential documents obtained through its status as a board observer) is hollow. Conversely, Spire says the balance of convenience favours dismissing the motion, pointing to the significant financial obligations that will be irrevocably triggered under a service agreement it has with a third party supplier (Kepler Communications Inc. ("Kepler")) if it is required to keep the three Failed Satellites in orbit and to keep providing images.

[9]     Spire claims that if it is not able to terminate its agreement with Kepler before the impending (extended) start date that may be triggered after the standby period that Kepler agreed to expires on September 12, 2024, the cost of later terminating that agreement (if, for example, the replacement satellites are never successfully launched and put into commercial operation) will be the entire amount payable to Kepler under it over its entire term, estimated to be USD $1.8 million.

[10]     It is that deadline that created the immediate urgency for this motion and the request by the parties that the court provide its decision within two days of hearing this motion, which concluded at close to 5:00 p.m. on September 10, 2024. In light of that timeframe for delivering this decision, the court apologizes for any lack of precision in, and the length of, this endorsement that would have benefitted from the additional editing time.

[11]     For the reasons that follow, NorthStar's motion for an injunction is granted.

[12]     At the hearing, which was scheduled on an urgent basis, NorthStar also brought two additional, related, motions:

> a. For a sealing and protective order in respect of certain confidential material that it alleges was improperly disclosed by Spire in its responding motion record and referred to during the cross-examinations and other materials (the "Sealing Motion");
>
> b. For relief arising out of alleged breaches of an interim services agreement that was embodied, on consent, into a court order dated August 30, 2024 (the "Compliance Motion").

[13]     These motions were not argued and are not being decided at this time. They may not need to be, depending on what the parties are able to agree to after receipt of this decision.

**Contractual Framework**

[14]     The key provision of the Agreement is section 12.

[15]     Section 12.1 provides as follows:

> In the event of a Block Failure other than as a result of a Launch Failure, Spire shall manufacture, launch, and operate sufficient additional Satellites to enable the applicable Service Level Agreement to be met in accordance with the following provisions:
>
> (a) the additional Satellites shall be provided on the same terms as the original Service Order and at no cost to Customer;
>
> (b) Customer shall have no further obligation to pay any Service Fees in relation to any Satellite of the Block that is a Block Failure until the additional Satellites have begun commercial service;
>
> (c) Spire shall use all commercially reasonable efforts to ensure that the additional Satellites have completed Checkout & Commissioning no later than eleven (11) months from the Launch of the Block of Satellites that is Block Failure ...

[16]     Section 12.2 of the Agreement provides as follows:

>Spire shall operate any Satellite that is part of a Block that is Block Failure but that itself is not affected by a Launch Failures or has successfully completed Checkout & Commissioning:
>
>(a) in the same manner as any other Satellite that is operating as described in the applicable Service Order;
>
>(b) in accordance with subsections 13.2 and 13.3 (Spire Satellite Operations); and,
>
>(c) at least until such time as the additional Satellites to be manufactured, launched and operated shall have been manufactured, launched and are operating.

[17]   Other defined terms in the Agreement include:

   a. Block is defined as "A group of Satellites ordered in the same Service Order."

   b. Block Failure is defined as "For a three (3) or six (6) Satellite Block, where two (2) or more Satellites are Launch Failures or fail Checkout & Commissioning within two (2) months of Launch."

   c. Checkout & Commissioning is defined as "The in-orbit tests to verify that a Satellite meets all specified requirements in the applicable Service Order."

   d. Launch Failure is defined as "A problem arising in connection with the Launch such that a Satellite cannot materially operate as described in the applicable Service Order ... "

   e. Clause 11.1 provides that "Spire shall conduct the Checkout & Commissioning: (a) following the Launch of a Satellite but prior to the commencement of any commercial operation of the Satellite ... "

**The Interim Services Agreement**

[18]   Data was being deliver to NorthStar as part of the testing for Checkout & Commissioning, which failed.

[19]   Spire ceased providing data from the failed satellites on July 1, 2024. This came after a dispute arose between the parties regarding future options that Spire presented to NorthStar in June 2024. Spire resumed providing data to NorthStar on July 26, 2024, after it, NorthStar and Kepler entered into an Interim Services Agreement ("ISA") to resume the supply of Image Data for further performance assessment and remediation purposes. The ISA was expressly not for the purpose of commencing commercial operation of the Failed Satellites.

[20]   From Spire's perspective, Kepler being a party to the ISA was essential so as to avoid any potential risk of Kepler classifying the supply of data as being commercial operation of the satellites within the meaning of the service agreement between Spire and Kepler (defined below,

the MSA), thereby triggering a three-year liability for Spire. Pursuant to the ISA, on a without prejudice basis NorthStar assumed responsibility for Kepler's fees of USD $16,700 per month per satellite and paid Spire USD $5,000 per month per satellite (recognized to be less than Spire's actual operating costs). This agreement initially lasted until August 30, 2024, but was extended until September 12, 2024. Kepler has said it will not agree to extend the ISA past September 12, 2024. Whether, in fact, that obligation is triggered under the MSA if it is not terminated by Spire on or before September 12, 2024 is not an issue that this court is deciding but is rather an issue as between Spire and Kepler. The court is simply dealing with this concern in the context of the potential harm that Spire may suffer if the injunction is granted.

[21]   It was an express term of the ISA (Clause 8), that "the Parties irrevocably undertake that they shall not rely upon the terms of this Agreement in support of any application for any interim or interlocutory relief, including but not limited to alleging that the provision of ISA has altered the circumstances of the Parties, either factually or legally, from those that existed prior to this Agreement."

**Undisputed Facts**

[22]   The following facts are not in dispute:

    a. The Block 1 Satellites were successfully launched on January 31, 2024. The Block 1 Satellites are not in launch failure.

    b. One of the Block 1 Satellites was lost in orbit in March 2024.

    c. The remaining three Block 1 Satellites went through Checkout & Commissioning between February and June 2024, and none of them were able to successfully complete and pass this testing and verification process. On July 1, 2024, Spire determined that the Failed Satellites had failed Checkout & Commissioning and will never be able to successfully complete it.

    d. The Block 1 Satellites are in Block Failure.

    e. None of the remaining Block 1 Satellites are operating within all of the requirements of the SLA. The Image Data produced by the Failed Satellites does not meet the Service Levels required by the Agreement.

    f. Spire has indicated that it will not have the additional (replacement) satellites manufactured, launched and successfully having completed Checkout & Commissioning eleven months from the original launch of the Block 1 Satellites. Rather, it estimated replacement service within 18-24 months.

    g. Spire negotiated a separate Master Service Agreement (the "MSA") with Kepler, which it entered into on April 12, 2022, shortly after the Agreement. NorthStar is not a party to the MSA.

    h. Under the MSA, Kepler agreed to provide data transmission services for the Image Data that would be captured by the Spire satellites pursuant to the Framework

      Agreement. The Kepler Service Fees are USD $16,666 per satellite per month once a satellite is put into commercial operation.

    i. If a satellite is put into commercial operation, the Termination Fee increases tenfold and becomes USD $599,976 per satellite (being the entire fee for the satellite for the three-year Service Period). As such, if the Failed Satellites are put into commercial operation, it will trigger a three-year liability for Spire to Kepler of approximately USD $1.8 million.

    j. Commercial operation under the MSA may be triggered by any commercial use of data transmission services outside of services for testing and commissioning purposes (which is the Service Start Date).

    k. Spire intends to terminate the MSA upon the expiry of the ISA on September 12, 2024 to ensure that it is terminated before any Service Start Date is triggered.

    l. Conversely, the Service Period as defined under s. 13 of the Agreement has not started and will not start until after the replacement Satellites have successfully completed Checkout & Commissioning.

**The Crux of the Dispute**

[23] One of the key issues at the arbitration will be whether Spire used all commercially reasonable efforts to ensure that the additional (replacement) satellites have completed Checkout & Commissioning eleven months from the launch of the Block 1 Satellites, by December 31, 2024, given its acknowledgement that this will not have occurred by that date.

[24] In the meantime, despite the Block Failure, NorthStar considers the data being delivered to be of value to NorthStar and its customers. With this data, NorthStar can demonstrate to its customers that its patented CONOPS is working. NorthStar's customers are able to observe the final product that flows from NorthStar's unique CONOPS by observing the images obtained from orbit in practice and not only through simulation. Without the delivery of the images from space through a system that was designed to match NorthStar's patented CONOPS (even if not operating to required specifications), the CONOPS cannot be tested and evaluated with actual data. NorthStar contends that this undermines the credibility of its system.

[25] According to NorthStar, while it may be able to get some images from other service providers and has approached some in order to determine what is available, there is no replacement data available to NorthStar to replace the data currently being provided by Spire, as no other data provider is in a position to meet the specific requirements of NorthStar's CONOPS. It was confirmed on the cross-examination of NorthStar's witness that the possible replacement data discussed in its confidential board presentation (now relied upon by Spire) was insufficient for NorthStar's purposes, in respect of both its customers and its own research and development work, even if that replacement data could be used as "backfill" for some purposes.

[26] At the crux of this dispute is NorthStar's desire to continue to have access to and make use of the images that are not entirely SLR compliant but that are being produced by the three and who should bear the cost of delivering those images in the interim? Spire says there will be a USD $1.8

million cost to keep its contract with Kepler in place to download the images unless that agreement is terminated by the extended deadline of September 12, 2024. Spire also has provided two estimates of its own costs to provide these images, one at USD $115,000 and the other at USD $229,000. Spire says that it is not obligated under the Agreement to provide images from Satellites in Block Failure, whereas NorthStar says it is.

[27]   Spire maintains that its obligation under the Service Order is to maintain the Missions Operations Centre, Ground Station Network, and Satellite Bus to deliver images to NorthStar is only during the operational life of the Satellites. Spire says that the operational life of the Satellites does not begin until they have successfully completed Checkout & Commissioning and that its obligation under the Service Order does not apply to these failed Block 1 Satellites. Because satellites that fail Checkout & Commissioning, by definition, cannot be operated in accordance with the Agreement.

[28]   Spire characterizes what NorthStar is asking for is an order for it to do the impossible: put the Failed Satellites into commercial operation under the Agreement.

[29]   NorthStar concedes that Spire cannot be ordered to operate the Failed Satellites in accordance with all of the requirements of s. 13 of the Agreement, but argues that the three Failed Satellites can nonetheless operate in certain respects as described in the Service Order 1. Without having had a full opportunity to review and consider all of the evidence on this point given the volume of material and time constraints under which the court is operating, I have concluded from the evidence and submissions that the Failed Satellites could be operated in a manner that is compliant with some of the requirements under some of the applicable Service Orders, but not all.

[30]   NorthStar says it is not asking for the Failed Satellites to be put into commercial operation but for Spire to keep the Failed Satellites operating at whatever specifications or standards under the SLA and associated Service Order they can fulfill in the interim until the replacement satellites are put into commercial operation. According to NorthStar, Spire should be required to fulfil its obligations under the Service Order at its own expense and even if they do not meet all of the Service Order specifications and are not in commercial operation, pending the outcome of the Arbitration. The question is whether s. 12.2 of the Agreement requires Spire to do this.

[31]   NorthStar appears to be willing to accept what it can get and will make do with Spire's best efforts to comply. That is essentially the order that it is seeking by its Compliance Motion, which seeks specific directions for compliance with Service Order 1 and the general duties of care and skill and diligence under s. 13 of the Agreement, allowing for certain specified exceptions and one addition. It says this is what is required to maintain the status quo because of orbital shifts of the satellites. This motion is not before the court to be decided at this time, but NorthStar suggests that it provides the necessary guidance around the operational specifications if an injunction is ordered requiring the continued operation of the Failed Satellites.

**The Arbitration**

[32]   In the intended Arbitration, NorthStar says that it will request the ICC Tribunal to award it remedies for:

    a. Spire's failure to continue operating the Satellites pursuant to s. 12.2 of the Agreement until replacement satellites are manufactured, launched, and are operating in accordance with the SLA; and

    b. Spire's anticipatory failure to replace the Block 1 Satellites before December 31, 2024, contrary to s. 12.1 of the Agreement.

**The Order Sought on this Motion**

[33]    NorthStar seeks:

    a. An order directing Spire to continue to deliver or cause any third party to deliver any data received from the Satellites at no cost to NorthStar;

    b. If necessary, and in the alternative, a mandatory order directing Spire to resume the delivery or cause any third party to resume the delivery of any data received from the Satellites;

    c. An interlocutory and interim injunction prohibiting Spire from ceasing to operate the Satellites and requiring Spire to operate the Satellites in accordance with the requirements of s. 12.2 of the Agreement.

[34]    While the requested order is part of the relief to be sought in the Arbitration itself, there is urgency because Spire will lose the ability to deliver the data from the Satellites after September 12, 2024 if it terminates its MSS with Kepler before the standby period expires, which it believes it needs to do to avoid triggering the USD $1.8 million obligation under the MSA.

**Analytical Framework for Requested Injunction**

[35]    The test for an injunction is well-established. An injunction should be granted where (a) there is a serious issue to be tried; (b) the moving party would suffer irreparable harm should the injunction not be granted; and (c) the balance of convenience favours granting the injunction: see *RJR-MacDonald Inc. v. Canada (Attorney General)*, [1994] 1 SCR 311, at pp. 348-349 and *Le Maitre Ltd. v. Segeren*, [2007] OJ No. 2047, at para. 30.

[36]    The "serious issue to be tried" standard in the traditional test is replaced with the "strong *prima facie* case" standard where the motion seeks a mandatory order. To ascertain this: "the application judge should examine whether, in substance, the overall effect of the injunction would be to require the defendant to *do* something, or to *refrain from* doing something." *R. v. Canadian Broadcasting Corp.*, 2018 SCC 5, [2018] 1 SCR 196, at para. 16. Here, the relief sought would require Spire to do something: deliver data from the Failed Satellites and keep them operating.

[37]    To demonstrate a strong *prima facie* case, the moving party must establish that it is "clearly right" and "almost certain", or there is a strong likelihood that, it will be successful at trial in proving the allegations set out in its statement of claim: see *CBC*, at paras. 15 and 17.

[38]    NorthStar submits that the court should apply a more relaxed merits standard where what the court is being asked to do is require a party to continue to perform its contractual obligations,

as that can be viewed as prohibitive rather than mandatory in the sense of restraining a party from terminating or ceasing to perform their obligations under a contract pending the determination of whether they have a right to do so. see *Cash Cloud v. BitAccess*, 2022 ONSC 5622, at paras. 42-44 and *674834 Ontario Limited v. Culligan of Canada Ltd.*, 2007 CanLII 8014 (ON SC), at paras 36-38.

[39]     NorthStar characterizes what it is asking for as an injunction requiring Spire to continue to comply with its contractual obligations under s. 12.2 of the Agreement, pending the delivery of the replacement Satellites, or at least until the determination of the disputes in the Arbitration: in other words, maintain the status quo. Spire says this is not an accurate characterization because NorthStar cannot rely on the ISA as the status quo (it contains an express clause prohibiting this), and prior to the ISA data was not being delivered for three weeks in July 2024. However, there is also no evidence to suggest that the Satellites had been decommissioned or "turned off" in that period.

[40]     Ultimately, NorthStar urges the court to consider the overall practical effects of the requested injunction, rather than getting caught up in semantics about how to word the relief as mandatory vs. prohibitory. see *Mosaic Potash Esterhazy Limited Partnership v. Potash Corporation of Saskatchewan Inc.*, 2011 SKCA 120, at paras. 43-48.  I do not put much weight on these decisions since they appear to have been overturned or overtaken by subsequent decisions, particularly *CBC*.

[41]     NorthStar also suggests that because the injunction is being sought within the context of a proposed arbitration under the ICA, the court should take into consideration the test that would be applied when granting interim measures under the Model Law, Ch. IV A, Article 17, under which the party requesting the interim measures need only satisfy the tribunal that there is a reasonable possibility that it will succeed on the merits of the claim (and the determination of this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination).

[42]     Article 17J of the Model law provides that: "A court shall have the same power of issuing an interim measure in relation to arbitration proceedings, … [and] shall exercise such power in accordance with its own procedures in consideration of the specific features of international arbitration."

[43]     I find this last argument the most compelling. The court is only being asked to consider the interim measures (this injunction) because of the urgency of the situation and the September 12, 2024 deadline. This would/should have otherwise been determined by the ICC Tribunal. In my view, one of the specific features of this arbitration under the ICA and applicable Model Law is that the party requesting the interim measures need only satisfy the tribunal that there is a reasonable possibility that it will succeed on the merits of the claim.

[44]     That standard falls somewhere on the spectrum between serious issue to be tried and strong prima facie case (although closer to serious issue to be tried). Taking into consideration the features of the Model Law that apply to the arbitration that the parties will become engaged in, that is the merits standard that I will apply to the determination of whether to grant the requested interim measures (injunction).

**Analysis**

[45]     The requirements that must be satisfied for the requested injunction/interim measure will each be addressed in turn.

*Is there A Reasonable Possibility that NorthStar Will Succeed in the Arbitration?*

[46]     I find there is a reasonable possibility that NorthStar will succeed in its claim that Spire has anticipatorily breached s. 12.1 of the Agreement. There has been a Block Failure. Spire told NorthStar in June 2024 that the replacement satellites will not have completed Checkout & Commissioning by December 31, 2024, which would be eleven (11) months from the Launch of the Block of Satellites that is in Block Failure. There is no evidence about whether Spire has used all commercially reasonable efforts to ensure that the replacement Satellites were delivered in this time frame. Questions about this were refused on cross examination. This leads me to conclude that there is at least a reasonable possibility that NorthStar will succeed on this claim.

[47]     I am also satisfied that there is a reasonably possibility that NorthStar will succeed in its claim that Spire will be in breach of s. 12.2 of the Agreement if it does not deliver data from the Failed Satellites and keep them operating (as it is threatening to do upon the expiry of the ISA on September 12, 2024), although this is a closer call. This obligation under s. 12.2 requires Spire to operate any Satellite that is part of a Block that is Block Failure but that itself is not affected by a Launch Failures *or* has successfully completed Checkout & Commissioning.

[48]     If s. 12.2 is read literally and the "or" is read disjunctively, it would appear to be straightforward to conclude that this section requires Spire to continue to operate the Failed Satellites in accordance with the applicable Service Order and subsections 13.2 and 13.3 (Spire Satellite Operations) at least until such time as the additional replacement Satellites have been manufactured, launched and are operating (as s. 12.1 contemplates they should be within eleven months from the original launch date, December 31, 2024). The Failed Satellites are part of the Block 1 Failure and are not themselves affected by a Launch Failure. If the "or" is disjunctive, then this section applies to the Failed Satellites.

[49]     However, Spire has pointed to a line of jurisprudence that gives the court the authority to interpret the word "or" as having a conjunctive meaning where the broader context of the contract and the intention of the parties demands it. see *Clergue v. Vivian & Co.*, (1909) 41 S.C.R. 607. Allowing for the words "and" and "or" to be interpreted in manner that is opposite to their conventional legal meanings is noted by Geoff R. Hall in *Canadian Contractual Interpretation Law*, 4th ed. (Toronto: LexisNexis, 2021), at pp. 293-294 (Ch. 9.1) to be consistent with the practical common sense approach to contract interpretation that the Supreme Court of Canada adopted in *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53, [2014] S.C.R. 633, at para. 47.

[50]     More recently, the Supreme Court of Canada has observed, in applying *Sattva*, that, "While the language used is central, courts recognize that words are not ends in themselves: they are a means to demonstrate, discern and determine the true intention of the parties". See *Earthco Soil Mixtures Inc. v. Pine Valley Enterprises Inc.*, 2024 SCC 20 at para. 64.

[51]    Spire has outlined a list of reasons in its written and oral submissions of why it would be commercially unreasonable for s. 12.2 of the Agreement to require it to continue to operate the Failed Satellites that had not ever successfully completed Checkout & Commissioning, including some of the challenges noted earlier about operating the Failed Satellites in accordance with Service Orders and specifications under s. 13 of the Agreement that they cannot meet. These are also outlined in, among other places, paragraphs 39 and 51-57 of its factum.

[52]    The commercial concept being that this section was meant to apply to Block Failures that involve some satellites that have failed and some that have not. A Block Failure does not require all satellites in the Block to have failed. This leads to an argument that has some suasion that the "or" in s. 12.2 should be read conjunctively as an "and" in this case, meaning that it is only satellites that are part of a Block Failure, but themselves have successfully launched *and* completed Checkout & Commissioning, that Spire is obligated to operate during the period in which replacement Satellites are being manufactured, launched and put into operation.

[53]    Spire's analysis does not account for the counter point from NorthStar that it was not involved in how the agreement was Kepler was negotiated and no common or objective understanding can be attributed to it about what now may be a mis-alignment of what might be considered commercial operation under the two agreements, but it is not contending that the Failed Satellites be put into commercial operation under its Agreement with Spire.

[54]    Rather, as I understand it, NorthStar seeks to have the Failed Satellites operated as they were while they were being tested and verified for Checkout & Commissioning, which did produce some useful data for NorthStar even if not in accordance with the SLR or the entirety of Service Order 1. Ultimately, NorthStar says it is not commercially unreasonable that the contract would entitle it to receive some data, as opposed to no data, from satellites in Block Failure but that did not themselves experience a launch failure, while the replacement satellites are being worked on, especially given it has already paid USD $14.5 million for satellites with design features aligned with its patented CONOPS to be sent up into space, even if they are not fully compliant and will eventually have to be replaced.

[55]    I accept that Spire's contractual interpretation argument (that the word "or" may be found to have been intended to be "and") knocks what might otherwise have been a strong prima facie case for NorthStar on the alleged anticipatory breach of s. 12.2 down to a case that may only have a reasonable possibility of success when it is eventually considered by the ICC Tribunal with the benefit of a complete record and with a full appreciation of the commercial context of this agreement. However, that is enough for NorthStar to meet the merits standard for the injunction it seeks on this motion.

*Irreparable Harm*

[56]    Harm is irreparable if it cannot be quantified in monetary terms or cannot be cured. *RJR*, at p. 341.

[57]    NorthStar says it has developed a recognized international reputation for its unique, patented CONOPS. NorthStar claims that its reputation is dependent upon its ability to provide secure, stable, and reliable imaging to its customers. If Spire ceases operating the Satellites or

providing data to NorthStar on September 12, 2024, as it intends to do, NorthStar maintains that it will suffer irreparable harm in terms of its status and reputation within its industry.

[58]     In addition, with respect to its research and development, NorthStar employs a team of people with specific technical expertise to carry out the CONOPS. If no images are delivered to NorthStar from the Satellites while Spire takes its time to manufacture, launch, and put into commercial operation the additional satellites pursuant to s. 12 of the Agreement, NorthStar's employees will have no dedicated images to work with to advance the CONOPS and NorthStar is concerned that it will lose many, if not all, of its specialized employees.

[59]     Spire challenges the irreparable harm evidence of NorthStar, concerning its potential loss of customers, employees and research and development (described earlier in this endorsement) as speculative and insufficient. Evidence of irreparable harm "must be clear and not speculative". Irreparable harm "is not made out simply because damages may be difficult to quantify" and must be sufficient to support a finding that irreparable harm "would" be suffered "not that it is merely likely". see *Thompson v. BEI Canada Inc.*, 2014 ONSC 3726, at paras. 60-61, and *David Burkes v. Canada Revenue Agency and Sheppard*, 2010 ONSC 3485 at para. 18. I agree that the assertions by NorthStar are just that, and are arguably weakened by the fact that, even with the data that it seeks to require Spire to deliver, it will not be able to service its customers.

[60]     However, NorthStar also contends that it will suffer irreparable harm because it may be unable to obtain full monetary compensation from Spire for its breaches given the limitation of liability clause (s. 34) contained in the Agreement, which may restrict the quantum and type of damages that NorthStar can claim. In *Androscoggen Energy LLC v Producers Marketing Ltd*, 2003 CarswellAlta 1899 at para. 19, the Court granted an application for interim specific performance (pending final disposition of the dispute at arbitration) in circumstances where, under the terms of the agreement, some of the monetary damages were not compensable such that they became irreparable harm.

[61]     A similar conclusion was reached in the English Court of Appeal decision of *AB v CD*, [2014] EWCA Civ. 229 at paras. 22, 24 and 33, where the court held that where a party to a contract had limited its liability or capped its damages for breach of its obligations, justice favoured granting of injunction to prohibit a breach. The court in *AB* favoured re-casting the question to be asked on an application for injunctive relief as: "Is it just in all the circumstances that a [claimant] be confined to his remedy in damages" and thus precluded from seeking a primary remedy of performance of the contract in appropriate circumstances?

[62]     An outright cessation of operations means that the Failed Satellites would either be deorbited or no longer commanded. Resuming operations would be difficult in the case of cessation of commanding and impossible in the case of deorbiting. Accordingly, NorthStar may forever be prevented from obtaining any data from the Satellites that it has invested over US $14.5 million in, even if successful at the Arbitration.

[63]     Through the interim measures sought by NorthStar pursuant to s. 5 of the ICA, it seeks to protect itself from any permanent and irreparable harm that may be caused by the Failed Satellites being turned off or decommissioned or permanently disabled until the ICC Tribunal can consider the alleged breaches of s. 12.2 of the Agreement. That will be irreversible if it happens, and until

it is known if and when replacement satellites will be launched and successfully complete Checkout & Commissioning, these may be the only satellites from which data can be gathered and provided to NorthStar that is compatible with its CONOPS (even if not wholly compliant with all Service Order and SLR requirements.

[64]    The above factors establish that NorthStar would suffer some irreparable harm (not compensable in monetary damages) if the injunction is not granted due to the limitation of liability clause in its contract and due to the effects of deorbiting or de-commanding the Failed Satellites before its case can be decided by the ICC Tribunal.

*The Balance of Convenience*

[65]    The final stage of the injunction test is a determination of which of the parties will suffer greater harm from the granting or refusing of the proposed interlocutory injunction. see *RJR*, at pp. 342-343.

[66]    The harm that Spire will suffer if the relief sought is granted is the USD $1.8 million liability to Kepler, being the price of the Service Contract under its MSA with Kepler if it is not able to terminate that before the Service Start Date. That is not an immediate up-front payment but rather the price of keeping Kepler's services in place to transmit the images from the Spire's satellites to NorthStar if Spire is ordered to do so. This amount would only be accelerated if the MSA is prematurely terminated.

[67]    Spire will also incur its own operating costs, estimated at either USD $115,000 or USD $229,000 per month, although these have not been particularized by Spire. Undoubtedly, Spire will incur some operational costs, but if NorthStar is correct, the Agreement places that risk on Spire during the interim period of operation under s. 12.2 while it works to replace the Failed Satellites.

[68]    NorthStar points to its undertaking as to damages as relief from the potential hardship that Spire may suffer if it has to pay Kepler a monthly data fee and incur its own monthly operational costs and NorthStar ultimately does not prevail in the arbitration. Spire suggests that the court should not place weight on the undertaking since it has evidence (through the confidential board material it obtained) that it says calls into question NorthStar's ability to make good on that undertaking. I have concerns about Spire's use of the confidential information it received but also do not want to make matters worse by getting into any of it while the Sealing Motion is pending. In the interests of expediency, since there was no time to deal with the sealing order motion, I will not place any significant reliance upon the NorthStar's undertaking as to damages to offset the inconvenience that Spire may suffer.

[69]     In the alternative, NorthStar has said, while not obligated to do so, to partially offset the inconvenience to Spire it is prepared to pay commercially reasonable fees for the operation of the Failed Satellites and for the data until a final determination is made on the merits at the Arbitration. It has obtained a quote from another industry participant (and competitor to Spire) for the cost to operate satellites of USD 8,000 per satellite per month, being USD$24,000 for three satellites.

[70]    This is significantly less than the combined cost of Kepler and Spire's monthly operating costs estimates, although Spire has not provided any substantive support for its estimated costs,

which appear to be an extrapolation from its projected gross margins based on projected revenues. The evidentiary record is not sufficient for me to determine what a commercially reasonable amount is for the cost to operate the Satellites. For the time being, I am ordering NorthStar to pay the amount it was quoted of USD $8,000 per Failed Satellite per month to Spire. This may be revisited upon a proper record, preferably before the Arbitration Tribunal.

[71]    The court recognizes that an injunction is an extraordinary remedy, and its impacts should be minimized. NorthStar is prepared to expedite the arbitration. That will lead to a quicker determination about whether Spire is required to continue to provide the data and to continue to incur the cost of operating the Failed Satellites and should be in all parties' interests, but may also alleviate some of the harm that Spire complains of.

[72]    Ultimately, I find that the expenses that Spire will incur to comply with the order sought are outweighed by the irreparable harm that NorthStar will suffer if the order is not granted.

[73]    Another argument that Spire raised in respect of the balance of convenience is that the grant of an injunction would involve the court either compelling performance of an impossible obligation or impermissibly creating a new and vague contractual obligation that will inevitably lead to ongoing litigation regarding compliance if Spire is required to operate the Failed Satellites "as described in the applicable Service Order" under s. 12.2 of the Agreement (which Spire asserts only applies to Satellites that have successfully passed Checkout & Commissioning and which NorthStar asserts also applies to Satellites that have failed Checkout & Commissioning). Spire says that a satellite that has failed Checkout & Commissioning cannot "meet all specified requirements in the applicable Service Order".

[74]    Spire argues that an order compelling it to provide any Image Data generated by the Failed Satellites regardless of the applicable Service Order, is not an order that even purports to enforce Clause 12.2, but rather an order that impermissibly creates an entirely new obligation on Spire that is too vague and will be difficult to police, requiring the parties to return to court which is not "convenient." It relies upon previous cases in which the court expressed concern about granting an injunction that would require supervision or will create ongoing litigation regarding compliance, or which is impossible to comply with: see *Thibodeau v. Air Canada*, 2014 SCC 67, [2014] 3 SCR 340, at para. 128.

[75]    As noted earlier, it does appear that NorthStar seeks to have the Failed Satellites operated as they were while they were being tested and verified for Checkout & Commissioning, which did produce some useful data for NorthStar even if not entirely in accordance with the SLA or entirely in compliance with Service Order 1. NorthStar seeks to address this through the Compliance Order that specifies which Service Order requirements are to be met.

[76]    The fact that the Failed Satellites may not be required to meet all Service Order requirements while being operated in this interim period under s. 12.2 is not a reason not to grant the order, although I do agree that the parties need to try to determine which requirements will be met, and if they cannot agree then they will need to come back to the court, or preferably the ICC Tribunal once constituted, for further directions in that regard.

*The Undertaking as to Damages*

[77]     This is often considered as part of the balance of convenience. In civil cases it is a standalone requirement. It is embodied in Article 17g of the Model law adopted under the Ontario *ICA*.

[78]     Spire points to two cases for the proposition that an inadequate undertaking as to damages is in and of itself grounds to deny an injunction: see *642947 Ontario Ltd. v. Fleischer*, 2001 CanLII 8623 (ON CA), at para. 70 and *Armes and 2331513 Ontario Inc. et al v. Barlett*, 2018 ONSC 1396, at para. 36.

[79]     As noted above, I have some concerns about referencing the evidence on the point of inadequacy given the fact that it was acquired by Spire under what NorthStar asserts was a confidentiality covenant and that has not yet been adjudicated.

[80]     However, I also do not accept the bald proposition that a concern about the substance behind the undertaking as to damages would necessarily on its own be a reason to deny an injunction in this case. The cases that Spire relies on are both cases in which that point was discussed but the outcome of those cases did not depend on the sufficiency of the undertaking. In *Fleischer*, concerns about the insufficiency of the undertaking was used to pierce the corporate veil at trial to hold the principals of the company that provided the undertaking responsible for the undertaking (and that was later overturned by the Court of Appeal because it was found that the injunction had not caused the alleged damages). In *Armes,* the court concluded that the moving party could not meet either of the irreparable harm or balance of convenience requirements for granting the injunction so the insufficiency of the undertaking was not the sole ground for denying it, it was simply an additional reason.

[81]     I have some concerns about the proposition that a party seeking an injunction may be subject to an inquiry into the sufficiency of its assets (akin to what the court engages in on motions for security for costs) in evaluating the sufficiency of an undertaking as to damages. I do not accept that there is any binding precedent that this insufficiency on its own would be grounds to deny the injunction. Nor would it directly apply to the consequences for failing to succeed after obtaining interim measures that can be imposed under Article 17g  of the Model Law.

[82]     Since I have determined, having regard to the other requirements, that the injunction should be granted I would not deny it solely on the basis of an alleged insufficiency of assets to back up the undertaking without some authority directly on point.  Therefore, I do not need to go into a detailed analysis of the information that is the subject of the Sealing Motion in order to decide this issue.

**Alleged Lack of Clean Hands**

[83]     Spire accuses NorthStar of not coming to court with clean hands because its board was considering contingency plans and other options for acquiring data, none of which have come to fruition, and trying to get ahead of potential issues by disclosing the challenges it is facing to its customers. These do not change the fundamentals of the analysis for the injunction.

[84]     I do not consider this to be the type of bad faith or lack of clean hands that would disentitle a commercial litigant to the type of relief sought.

**Costs**

[85]     The parties exchanged their costs outlines after the hearing and before the outcome of the motion was known. They were unable to reach an agreement on costs. They have each submitted costs outlines. Having considered the issues, the relevant factors under Rule 57, the attempts by the parties to resolve matters despite the very divergent positions, the principle of proportionality, and in the exercise of my discretion under s. 131 of the *Courts of Justice Act*, I have determined that partial indemnity is the appropriate scale of costs. As the successful party, NorthStar is entitled to an award of partial indemnity costs for this motion.

[86]     Spire's costs outline indicates all-inclusive partial indemnity costs of $121,035.51. NorthStar's costs outline indicates all-inclusive partial indemnity costs of $268,415.73. It is not unusual for the costs of the moving party on an injunction motion to be higher given the higher burden they carry. It is also not unusual for the hourly rates of lawyers at Toronto Bay Street law firms to be higher than those of lawyers from outside of Toronto. That would explain some of the difference between the two costs outlines. That said, having regard to the principle of proportionality and what Spire might reasonably have expected to pay in costs if it lost this motion, I have determined that the appropriate amount of partial indemnity costs to award to NorthStar for this motion is $195,000. This is roughly splitting the difference between the two costs outlines, which is rough justice but there is no magic formula from which to determine the precise amount.

**Final Disposition**

[87]     The motion is granted, with an order for the relief sought in paragraph 108 (i) (ii) and (iii) of NorthStar's factum, plus an order partial indemnity costs fixed in the all-inclusive amount of $195,000 payable by Spire to NorthStar forthwith. NorthStar shall pay USD $8,000 per month to Spire for each Failed Satellite that continues to be operated during this injunction period as a contribution towards the cost to continue to operate these satellites and provide images to NorthStar from them.

[88]     NorthStar shall commence the arbitration immediately (by no later than September 20, 2024) and request that it be expedited, with or without Spire's co-operation, although it would expect it will be in Spire's interests for it to be expedited.

[89]     I am not convinced that the Compliance Motion is necessary as currently constituted. The specifications that are set out in that Notice of Motion at paragraph 34 (a) may assist in defining Spire's obligations under this injunction order. That should be addressed by the Arbitral Tribunal if possible, but a case conference may be scheduled before me if necessary for further directions about what Spire is required to do and whether the Compliance Motion, or some other motion or case conference, needs to be scheduled for further directions in that regard.

[90]    The sealing order has not been adjudicated. The impugned confidential material was filed by the respondent with the court. I am granting leave on a temporary basis for the responding material (e.g. affidavits, exhibits, transcripts) that contains the confidential documents and information over which a sealing order is sought to be removed from the court file and replaced with redacted versions of that material. The respondent is ordered to do this in consultation with the application. The parties shall schedule a case conference to discuss what is to be done about the sealing order motion.

[91]    I am grateful to counsel for the obvious amount of effort that went into preparing for this motion and the high quality of the material that both sides prepared in advance that has enabled this decision to be rendered in the requested time frame.

_____
Kimmel J.

**Date:** September 12, 2024