P2CRSPIo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SPIRE GLOBAL SUBSIDIARY, INC.,

              Plaintiff,

       v.                    24 Civ. 8434 (JHR)(SLC)

NORTHSTAR EARTH & SPACE, INC.,

                       Oral Argument

              Defendant.

------------------------------x

                       New York, N.Y.
                       February 12, 2025
                       11:30 a.m.

Before:

                HON. SARAH L. CAVE,

                       U.S. Magistrate Judge

               APPEARANCES

FAEGRE DRINKER BIDDLE & REATH LLP
    Attorneys for Plaintiff
BY:  BRIAN P. MORGAN
    W. JOSHUA LATTIMORE

GREENBERG TRAURIG, LLP
    Attorneys for Defendant
BY:  SYLVIA SIMSON
    MICHAEL M. MIRDAMADI

P2CRSPIo

1          THE COURT:  Good morning, please be seated, everyone.

2          (Case called)

3          MR. LATTIMORE:  Good morning, your Honor.  Brian

4    Morgan and Joshua Lattimore from Faegre Drinker Biddle & Reath

5    for the plaintiff Spire Global.  We're also joined by Ari

6    Rutledge, who is a legal clerk in my firm awaiting admission.

7          THE COURT:  All right.  Good morning and welcome.

8          MS. SIMSON:  Good morning, your Honor.  Sylvia Simson,

9    Greenberg Traurig, for NorthStar Earth & Space, Inc.  I'm

10   joined by Mike Mirdamadi.  We also have one of our law clerks,

11   Jowel Uddin, just observing in the audience.

12         THE COURT:  Good morning and welcome.  So we are here

13   this morning on NorthStar's motion to compel arbitration and

14   for a stay pending arbitration.  We've read the parties'

15   submissions, which were very helpful.  Thank you.  And in

16   response to the parties' request, we wanted to hear argument on

17   this.  We have a few questions for you.  You are welcome to

18   sit, stand, take the podium, wherever you are more comfortable

19   and have your materials, as long as you are near a microphone

20   so our wonderful court reporter can get every word that you

21   say.

22         Ms. Simson, do you want to take the floor first?

23         MS. SIMSON:  Sure, your Honor.  Good morning.

24         THE COURT:  Good morning.

25         MS. SIMSON:  As your Honor certainly knows from

P2CRSPIo

1    reading the papers, on September 20, 2024, NorthStar initiated

2    an international arbitration before the ICC against Spire

3    relating to, among other things, Spire's breach of the parties'

4    March 1, 2022, framework agreement, which governs their

5    vendor-customer relationship.  And that arbitration filing

6    followed a September 12, 2024, ruling in the Ontario Superior

7    Court of Justice, which granted NorthStar's motion for

8    interlocutory injunction finding that there would be a

9    reasonable possibility that NorthStar would succeed on their

10   breach of contract claims against Spire.

11          Then A month later, Spire filed a motion for summary

12   judgment in lieu of complaint in New York State court demanding

13   immediate payment of a promissory note under which Spire agreed

14   to give vendor financing to NorthStar for services to be

15   provided by Spire under the preexisting framework agreement.

16   Now, Spire demands this $4.5 million payment notwithstanding

17   the pendency of this first-filed ICC arbitration, and Spire's

18   disputable nondelivery of the services that NorthStar was even

19   paying for in the first place.  This Court should reject

20   Spire's money grab for $4.5 million and stay their pending

21   summary judgment motion pending the conclusion of the ICC

22   arbitration.

23          THE COURT:  One question that we had, it looked to us

24   from what you've submitted that the question of arbitrability

25   has been submitted to the ICC panel.  First of all, is that the

P2CRSPIo

1    case?  And if it is, what if I decide it one way and the panel

2    decides it another?  In other words, first of all, as a factual

3    matter, is that the case?  And then second, how do I deal with

4    the potential for different decisions on that?

5              MS. SIMSON:  Sure, your Honor.

6              So to the extent there's been any submission with

7    respect to the promissory note and whether that should be part

8    and parcel with ICC arbitration or not, the first-filed rule

9    should govern.  So the ICC arbitration should determine that in

10   the first instance.  The framework agreement also invokes the

11   ICC rules, which shows that the parties intended for the

12   arbiter to determine questions of arbitrability in the first

13   instance.

14             THE COURT:  Okay.  So I wanted to ask about that.  So

15   I think it's footnote three of your --

16             MS. SIMSON:  In which brief, your Honor?

17             THE COURT:  I think of your brief.  That's the

18   relevant ICC rule that you're saying -- I think it's rule 6.5

19   that gives the arbitrability question -- that gives the panel

20   power over the arbitrability question; is that right?  I think

21   that's page 5 of your brief.

22             MS. SIMSON:  Yes, your Honor.

23             THE COURT:  Okay.  And so, what is the status of the

24   arbitration at this point in time?

25             MS. SIMSON:  Right now, your Honor, the panel has been

P2CRSPIo

1    fully impaneled.  There are three arbitrators that have been

2    decided by the parties and are officially in place.  The first

3    status conference in the ICC arbitration is scheduled for next

4    Friday, so the 21st of February.  You know, as far as NorthStar

5    is concerned, we're raring to go.  We've asked for expedited

6    consideration of this arbitration.  Spire, at every turn, has

7    been trying to delay and drag out the arbitration proceedings,

8    but NorthStar has been raring to go since September and

9    certainly will be urging that at next Friday's conference.

10          THE COURT:  And is there discovery that is

11    contemplated as part of arbitration or are you just planning to

12    go straight to a hearing?

13          MS. SIMSON:  I think there might be some limited

14    discovery, your Honor.  I'm not appearing in the arbitration at

15    this present time.  Counsel in Canada is currently engaged in

16    that, so we're cocounsel for this matter at the present time.

17    But there certainly will be some discovery and an exchange of

18    information, I'm sure.

19          THE COURT:  Okay.  And as it stands now, the framework

20    agreement still exists and the parties are operating under the

21    framework agreement, correct?

22          MS. SIMSON:  Yes.  The framework agreement certainly

23    is still in place.  It has been in place since the dispute

24    first arose between the parties.  Right now, whether or not

25    Spire has actually performed the services set forth in the

P2CRSPIo

<pre>
 1   framework agreement is what's at heart in the ICC arbitration.

 2   Right now, there's two kind of competing portions of the

 3   arbitration, your Honor.  One of them is whether or not -- I'll

 4   take a step back.

 5          THE COURT:  Yes.

 6          MS. SIMSON:  Under the agreement, if your Honor has

 7   taken a close look at it --

 8          THE COURT:  Yes.

 9          MS. SIMSON:  -- NorthStar is a company that owns a

10   unique kind of patented space-based situational awareness

11   technology.  And then, to leverage that technology into a

12   service for NorthStar's customers, NorthStar requires images

13   and data from space from space satellites, and it retained

14   Spire as the service provider to manufacture, launch, and

15   operate those satellites in space.

16          Right now, the four satellites, called the Block 1

17   satellites, there were four of them.  One of them has

18   disappeared into the ether.

19          THE COURT:  Right.

20          MS. SIMSON:  The other three are currently not

21   performing to the specifications that the parties intended.

22   There is a dispute between the parties that kind of goes in

23   both directions.  One is whether or not Spire needs to maintain

24   the three that they can still locate, right, and assist

25   NorthStar with getting data for its customers and keep those
</pre>

P2CRSPIo

1    operational.  And then, there's the second dispute, which is

2    the replacement of the satellites that were not manufactured to

3    code, if you will, under the agreement.

4                THE COURT:  Okay.

5                MS. SIMSON:  So, yes, the framework agreement is in

6    place.  What is required next under the framework agreement is

7    in dispute.

8                THE COURT:  Sure.  Okay.  And what is the goal of

9    NorthStar initiating the arbitration?  Is it that they are

10   seeking to, I assume, have Spire fulfill its obligations under

11   the framework agreement and have a continuing relationship

12   going forward, or is NorthStar seeking to end the agreement and

13   get out of its obligations?

14               MS. SIMSON:  So I think right now where we are, your

15   Honor, is we certainly want the three satellites that are

16   currently in place to stay operational.  That is critical to

17   NorthStar's business, and there are third parties that

18   NorthStar has relationships with that obviously need that data.

19   So maintaining that is of critical import to NorthStar.  So we

20   certainly would not want that to stop.

21               With respect to the replacement, I think there's --

22   you know, the 11-month time frame by which those have to be

23   replaced has come and gone.  That was the end of 2024.  There's

24   still some ambiguity as to the replacement status.  So I can't

25   answer your question directly, your Honor, at this time.  But I

P2CRSPIo

1    think there's some combination under what are they actually

2    going to do under the agreement, and there's a significant

3    damages component, both with respect to the $10 million-plus

4    NorthStar has already paid thinking that, of course, Spire was

5    going to abide by its contractual obligations to maintain and

6    to replace if necessary, but also damages that could incur

7    every single day that this is dragging out longer.  And there

8    are ramifications with respect to NorthStar's downstream

9    business to its customers.

10           THE COURT:  Okay.  One more question before you get to

11    your presentation.

12           MS. SIMSON:  Of course.

13           THE COURT:  It's just about the promissory note

14    arising.  It struck me as a little odd.  It sounded like——and

15    as you just said——that NorthStar has paid Spire significant

16    amounts of money under the framework agreement.  And as I read

17    it, the promissory note is basically Spire giving NorthStar a

18    loan for something, and it just struck me as sort of an odd

19    arrangement.  And so, can you give me any more backstory on how

20    the promissory note came into being and what the purpose is?

21           MS. SIMSON:  I absolutely can, your Honor.  I was

22    prepared to do that today because I figured the genesis of the

23    promissory note was probably going to be a question.

24           So the genesis for this agreement to provide vendor

25    financing, it was described in NorthStar's request for

P2CRSPIo

1    arbitration that was filed on September 20.  If your Honor

2    wants to read it in writing, it's all laid out there, and that

3    was exhibit 4 to my declaration.  Spire was responsible to

4    purchase services from a launch provider for the Block 1

5    satellites, so the four satellites at issue.  The initial

6    launch provider that they came up with said it was ending

7    operations.  The second launch provider that they identified

8    went into bankruptcy.  And then, it was Spire's obligation, but

9    at this point NorthStar has paid millions of dollars in

10    investment for its mission, and they need these satellites.

11    They used their relationship to find an option for its mission,

12    which was a company called Rocket Lab and got it at a

13    discounted rate.

14            But then, in March 2023, Spire informed NorthStar it

15    would not use Rocket Lab as it was too expensive, and it didn't

16    come back with any other option that would actually serve the

17    mission that NorthStar was trying to do.  So given the

18    significant investment that NorthStar had already put in, it

19    was faced with no option, right.  It was between a rock and a

20    hard place.  And so, it agreed to pay for the additional costs

21    above that second bankrupt entity.  What that cost, I guess,

22    estimate that had been given and then the estimate that was

23    being given by the option that NorthStar found, that

24    difference, it agreed to cover.

25            So the promissory note, as it says on the face of the

P2CRSPIo

1    note, it's a deposit for services to be rendered by Spire, but

2    that was kind of the genesis of the promissory note.

3    Essentially, despite it being Spire's obligation to procure the

4    launch provider, it didn't want to pay that difference.

5              THE COURT:  I see.  So the $4.5 million roughly

6    represents the incremental additional cost of using Rocket Lab

7    as the launch provider?

8              MS. SIMSON:  As I understand it, your Honor.

9              THE COURT:  Okay.

10             MS. SIMSON:  And there was also -- kind of part and

11   parcel to the promissory note, there was an amendment to the

12   agreement that is set forth as an attachment to my declaration.

13   That was about ten days before the promissory note was entered

14   into, but they were all kind of part and parcel of the same

15   thing.

16             In August of that year, they also had a term sheet

17   that kind of set forth the parameters of what was going to be

18   taking place in the promissory note.  So I think that sheds a

19   little bit of light on what I just described.  It says that

20   Spired, as the vendor, would agree to finance the services

21   purchased by NorthStar from the vendor under the framework

22   agreement.  And then the term sheet defines disbursement as an

23   equivalent principal amount of note will be issued to the

24   vendor as evidence of a deposit for services to be rendered by

25   Spire.

P2CRSPIo

| | |
|---|---|
| 1 | THE COURT:  That's in the promissory note? |
| 2 | MS. SIMSON:  That is in the term sheet attached to |
| 3 | exhibit 2 to my declaration that sets forth the parameters |
| 4 | signed by the parties on August 24, 2023.  So just a few months |
| 5 | before the promissory note was actually entered into. |
| 6 | THE COURT:  All right.  You can return to your |
| 7 | presentation.  Thank you. |
| 8 | MS. SIMSON:  Great, your Honor. |
| 9 | So part of where I wanted to begin was giving a little |
| 10 | backstory on the parties' relationship.  We've already done |
| 11 | that.  The framework agreement here is really the foundational |
| 12 | document that governs the parties' business relationship, and |
| 13 | it details each parties' obligations thereunder.  As I |
| 14 | mentioned before, NorthStar agreed to pay significant sums to |
| 15 | Spire up front, including a monthly set-up fee of over half a |
| 16 | million dollars every single month to facilitate Spire's |
| 17 | obligation to manufacture, launch, and operate those four |
| 18 | satellites in space. |
| 19 | So Section 49 of the framework agreement is really |
| 20 | what is at the heart of the agreement here, which contains a |
| 21 | broad mandatory arbitration clause that requires the parties to |
| 22 | arbitrate any dispute between them relating to the agreement or |
| 23 | its subject matter, and I'm going to read directly from |
| 24 | paragraph 49 of the framework agreement.  "Any dispute or claim |
| 25 | arising out of or in connection with this agreement or its |

P2CRSPIo

 1    subject matter or formation, including noncontractual disputes

 2    or claims, shall be finally settled under the rules of

 3    arbitration of the International Chamber of Commerce."  And

 4    then it goes on to say that it shall be in Ontario, Canada.

 5            So in our view, we say the language "any" and "arising

 6    out of or in connection with this agreement or its subject

 7    matter" is a broad arbitration clause, it's the axiomatic broad

 8    arbitration clause and --

 9            THE COURT:  Sure.  But obviously the parties knew

10    about this section 49 of the framework agreement when they

11    drafted the promissory note, which has a forum selection clause

12    that refers to New York.  So why isn't there either an express

13    incorporation of the arbitration provision or some other

14    reference to it in the promissory note?

15            MS. SIMSON:  Your Honor, I think the way that we're

16    viewing this is that the two documents -- first of all, they

17    are inextricably intertwined.  The promissory note refers back

18    to the framework agreement on its face.  But more importantly,

19    those two provisions are complementary to each other.  They are

20    not conflicting.  There's no requirement with respect to

21    looking at this that the clause in the promissory note must

22    expressly say anything about arbitration at all.  In fact, the

23    standard is that it doesn't specifically preclude arbitration,

24    and it certainly doesn't provide a positive assurance of an

25    intent to preclude arbitration, which is the standard.

P2CRSPIo

1                As we set forth -- go ahead.

2                THE COURT:  I'm just struggling with it's the same

3        parties.  The promissory note arises not that far in time from

4        the framework agreement, so it's odd to me that the parties

5        would be referring to any other forum or any other mechanism

6        for resolving their disputes than the arbitration clause in the

7        promissory note.

8                MS. SIMSON:  So I think there's two ways to look at

9        this.  I think one is the text of the actual promissory note,

10       and we'll turn to that in a moment.  But I first would like to

11       start with the fact that they are complementary.  I know we

12       touched on this a little bit in our reply brief, but if you're

13       looking at it──just give me a moment, your Honor──section 15 of

14       the note can be read as providing that actions, litigations, or

15       proceedings to confirm or vacate an arbitration award should be

16       filed in New York courts.  So that is something that was

17       obviously contemplated in the framework agreement.

18               THE COURT:  Right.

19               MS. SIMSON:  And I think it makes perfect sense

20       because NorthStar is a Canadian company, and Spire is an

21       American company.  So if they wanted to have NorthStar initiate

22       any action, it makes sense they would want it in the United

23       States.  New York City being a forum that many parties select

24       for that reason.

25               With respect to looking at the actual text, I also --

P2CRSPIo

```
1    one moment, your Honor before I turn to the text.  Another
2    thing that is important to look at is, obviously, there's been
3    a lot of talk of the payment component of the promissory note.
4    But there's a lot of other things in the promissory note that
5    are not addressed in the framework agreement, and I think we
6    need to look at that carefully.
7            For example, there's a board observer right that is
8    set forth in the promissory note for Spire, right.  To the
9    extent——and we'll look at the text in a moment——NorthStar
10   wanted to bring an action against Spire somehow related to
11   those board observer rights, right, that's not set forth in the
12   framework agreement.  That would not be arising out of
13   connection in the agreement or subject matter.  That would
14   relate to the note, right, which makes sense why the text of
15   the promissory note is talking about actions that are brought
16   by NorthStar, not actions that are brought by Spire.
17           I would like to direct your Honor's attention to the
18   actual text of the promissory next.  I think, you know, let's
19   look at each section of it in turn.  It starts off by just
20   talking about the governing law.  So it needs to be interpreted
21   under New York law.  Fine, right.  But then the second sentence
22   says, "The borrower," which is NorthStar, "irrevocably and
23   unconditionally agrees that it will not commence any action
24   outside the State of New York."  And then, if you go on to look
25   at the second half of that sentence, "and each of the parties
```

P2CRSPIo

 1    hereto irrevocably and unconditionally submits to the exclusive

 2    jurisdiction of such courts and agrees that all claims in

 3    respect of any such action, litigation, or proceeding."  So

 4    when it's saying "in respect of any such," it's referring to

 5    back to "any action, litigation, or proceeding" that was filed

 6    by NorthStar.

 7         And then, it goes on to say, it's just both parties

 8    agreeing that any final judgment in any action brought by

 9    NorthStar can be enforced in other jurisdictions.  Again, it's

10    referring back to any such action, litigation, or proceeding.

11    And then again, the late sentence is NorthStar agreeing to

12    waive venue and inconvenient forum objections, which, again,

13    makes sense.  It's a Canadian company, right.

14         So I think the standard is that in this particular

15    context, where there's nothing in Section 15 of the promissory

16    notes that specifically addresses the parties intention to

17    limit the arbitration clause that had been decided in their

18    master agreement, the framework agreement that governs their

19    relationship.  The standard is that you have to look at these

20    as whether or not they can be viewed in a complementary manner,

21    and we think they can, right.

22         Spire, to the contrary, has not posited any kind of

23    complementary understanding of how these two documents can work

24    together.  They are trying to draw them as totally separate

25    agreements, somehow positing that they are a different

P2CRSPIo

1  relationship, but they're not, right.  Right now and still

2  today, they are in a customer-vendor relationship.  The

3  promissory note arising out of and would not exist but for the

4  framework agreement.  And there's a way to look at what the

5  parties intended by section 15 in a complementary manner with

6  the broad arbitration clause in section 49 of the framework

7  agreement.

8          THE COURT:  Thank you.

9          MS. SIMSON:  Your Honor, just making sure that we

10  don't repeat arguments.  I know we've spoken a little bit about

11  the text.  I think it's important to note that the note makes

12  clear twice that its enforcement is subject to equitable

13  principles.  I know we talked about this in our opening brief.

14          Section 7(c) of it says, "This note constitutes the

15  legal, valid, and binding obligation of the borrower and is

16  enforceable against the borrower in accordance with its terms

17  subject to...general principles of equity.  And then, paragraph

18  17 has a similar reference where the borrower is ratifying the

19  framework agreement and has language that says "except as

20  enforcement may be limited by equitable principles."

21          I think it's important right now, you know, looking at

22  this from a mathematical equation, why should NorthStar pay

23  another $4.5 million for services it did not receive, and more

24  importantly, it has a pending breach of contract claim in the

25  ICC arbitration.  That's just going to -- it has a duty to try

P2CRSPIo

 1    and mitigate its damages.  Why is it going to pay money it's

 2    then going to demand back in the ICC arbitration which was

 3    first filed.

 4                THE COURT:  Right.  It also looks like one of the

 5    arguments that Spire is making in the arbitration is that

 6    NorthStar has breached the governing law provision of the

 7    promissory note by starting the arbitration and referencing the

 8    promissory note.  So how do you respond to that argument?  And

 9    if so, an adverse ruling by the panel on that issue, what would

10    that mean for the motion in this case?

11                MS. SIMSON:  So, obviously, we don't think that we

12    breached anything, right.  I think the two documents are

13    inextricably intertwined with one other.  And just as we would

14    think that the breach of contract that they have performed

15    under the framework agreement needs to be addressed in

16    arbitration, their demand for payment for $4.5 million when it

17    has not even delivered the services that the deposit was being

18    made for, that should be wrapped up and heard by the same

19    panel.

20                You know, we don't view -- I understand that they

21    might view section 15 of the note to govern this dispute, but

22    we do not.  We think this section 49 of the framework agreement

23    governs, and so for the same reasons, I think, you know we

24    would stand on there certainly is no breach here.

25                THE COURT:  Okay.  Thank you.

P2CRSPIo

1          Are there any particular cases that Spire has noted

2     that you want to make sure that we understand why they're

3     distinguishable?

4          MS. SIMSON:  Sure, your Honor.  I think we addressed

5     some of them in our reply brief, but I really think the one

6     that we want to look at——one moment, your Honor——is the *Holick*

7     case.  They make this big proclamation in their opposition

8     brief that there is somehow a difference in the relationship

9     between the parties, and that certainly is not the case.  The

10    case that they rely upon, *Holick v. Cellular Sales*, in that

11    agreement, there was actually a change -- sorry -- in that

12    case, there was a change from an independent contractor

13    relationship between the parties in the sales agreement to then

14    an employment relationship between the parties in the

15    compensation agreement.  And in each of those two contracts,

16    they governed a different type of employment relationship at a

17    different time period, and they never operated simultaneously.

18         Here you have two different agreements that are

19    inextricably intertwined with one another, and they are

20    operating simultaneously.  They are part and parcel of the same

21    thing.  Again, the promissory note is a deposit for services to

22    be rendered in the future by Spire.  So from our view, that

23    just does not support their theory that there's a different

24    relationship here that needs to be looked at when you're

25    looking at the two agreements.

P2CRSPIo

| | |
|---|---|
| 1 | THE COURT:  Okay.  Has the panel ruled on NorthStar's |
| 2 | request for expedited consideration of the arbitration |
| 3 | proceeding? |
| 4 | MS. SIMSON:  The currently formed panel has not heard |
| 5 | that issue yet, your Honor. |
| 6 | THE COURT:  Okay.  And what is the expected time |
| 7 | difference between expedited versus normal under ICC procedure |
| 8 | in terms of how long it would take to reach a final award? |
| 9 | MS. SIMSON:  I think it depends on the case, your |
| 10 | Honor.  We're obviously going to be arguing for it to move as |
| 11 | quickly as possible.  Obviously, Spire is, at every turn, |
| 12 | saying they need more time, that there needs to be more here. |
| 13 | So I think we'll see next Friday kind of where things shake |
| 14 | out.  But it's NorthStar's position that things should move |
| 15 | forward as quickly as possible because every single day that |
| 16 | this is dragging out, it's a problem for them with respect to |
| 17 | their business. |
| 18 | THE COURT:  And have you had to inform the panel of |
| 19 | how long——I know you said there might be some discovery, but |
| 20 | how long the arbitration itself might take place, how long the |
| 21 | hearings is going to take place? |
| 22 | MS. SIMSON:  I don't know that we've taken a formal |
| 23 | position on that, your Honor. |
| 24 | THE COURT:  Thank you. |
| 25 | MS. SIMSON:  I want to make sure we touch every single |

P2CRSPIo

1    legal argument here because some of them we've already

2    addressed, but some we have not.  The framework agreement is an

3    international commercial contract that is governed by the New

4    York convention and has a presumption of arbitrability, and so

5    I think we have to start there.  NorthStar's motion here thus

6    has to be resolved under the body of law governed by the FAA.

7    And as with every case governed by the FAA, you are looking at

8    whether there's a valid agreement to arbitrate, and if so,

9    whether it falls within the scope.  From our position, there's

10   a valid agreement to arbitrate.

11           Spire has conceded validity to the arbitration

12   agreement in the framework agreement.  They're just suggesting

13   that there's some kind of carve-out that doesn't appear on the

14   face of the document.  They're reading that into the language

15   of paragraph 15 in the promissory note.  As we argued in our

16   motion, the framework agreement controls, as the promissory

17   note does not specifically preclude arbitration and does not

18   provide positive assurance of intent to preclude arbitration.

19           We cited multiple cases in our briefing, but I would

20   like to draw your Honor's attention to the case *Offshore*

21   *Exploration & Production, LLC v. Morgan Stanley Private Bank*

22   *N.A.*, which is 626 Federal Appendix 303, Second Circuit 2015.

23   In that case, and I'll read directly from the decision, your

24   Honor:  "Offshore maintains that the parties' consent to

25   jurisdiction in New York courts conflicts with their agreement

P2CRSPIo

1    to arbitrate under the SBA and that because of the supremacy

2    clause that conflict must be resolved against arbitration.

3    That argument fails because the SBA in the escrow agreement

4    does not limit or supersede the parties' agreement to arbitrate

5    all disputes under the SBA.  An agreement to arbitrate is

6    superseded by a later-executed agreement containing the forum

7    selection clause if the clauses specifically preclude

8    arbitration, but there is no requirement that the forum

9    selection clause mention arbitration."

10        And against the Second Circuit's standard there that

11    the later-in-time agreement must specifically preclude

12    arbitration, there is no such reference in paragraph 15 of the

13    note that does that.  And there's many different ways they

14    could have written it differently if that was really the

15    intent.  But the carve-out, if you will, that Spire is

16    contending exists does not exist on the face of paragraph 15 if

17    we're looking at the text.  And there's certainly, again, no

18    positive assurance that the parties intended to no longer

19    arbitrate a dispute between them.

20        Note 15 does not limit either party's right to compel

21    arbitration of disputes.  And I think it's important, your

22    Honor, to note that in order to provide that positive assurance

23    that I just mentioned, the later-executed forum selection

24    clause here in the promissory note has to be all inclusive and

25    mandatory.  Section 15 of the note is not all inclusive and

P2CRSPIo

1    mandatory and necessarily cannot override the broad arbitration

2    clause in the framework agreement.

3            I know I've already gone through each section of the

4    text, so I won't do that again, your Honor.  But in that

5    context, we have broken it down in that section of our opening

6    brief.  And again, as I mentioned, we have to look at these as

7    complementary.  We can think that you can do that here.  They

8    are not conflicting.  I would also point your Honor to several

9    different cases that we cited in our opening brief where it was

10   determined that primacy should go to the earlier-in-time

11   agreement.  Those are on pages 20 to 21 of our opening brief.

12           THE COURT:  Right.

13           MS. SIMSON:  And we think for all the same reasons,

14   your Honor should find the same because they can be reviewed in

15   a complementary fashion.  I know I've already addressed Spire's

16   theory that the business relationship changed between the

17   parties, which I think is part and parcel of that argument, so

18   I won't repeat myself, but the note was merely memorializing

19   Spire's agreement as to why the vendor financing for the

20   services and remained the service provider.

21           A couple of other things before I turned to breadth of

22   the arbitration clause.  The lack of merger clause in the note

23   further supports that it was intended to supplant -- that it

24   was not intended to supplant the framework agreement.  The

25   framework agreement has a merger clause in section 44.  The

P2CRSPIo

1    note does not.  And the absence of that merger clause in the

2    note confirms that the parties did not intend for it to

3    displace the arbitration clause.

4         Turning to the second kind of inquiry here once we

5    have a valid agreement to arbitrate, which is it does fall

6    within the scope.  I already mentioned it's a very broad scope.

7    Axiomatic falls within the scope.  In that case, your Honor, I

8    would point to the case *Ace Capital Re Overseas Ltd. v. Central*

9    *United Life Insurance Company.*  That's 307 F.3d 24, Second

10   Circuit 2002.  In that case, your Honor——and I'm quoting from

11   the decision——the Second Circuit said, "When parties use

12   expansive language in drafting an arbitration clause,

13   presumably they intend all issues that touch matters within the

14   main agreement to be arbitrated."  And that touch matters

15   standard is what we intend applies here.  Certainly the dispute

16   with respect to payment touches matters under the arbitration

17   agreement as it, I think, falls part and parcel with the

18   services that were to be rendered by Spire.

19        Lastly, your Honor, I know we have talked a lot about

20   that standard.  I think there's two alternative arguments that

21   we've made here.  One is the first-filed rule.  ICC arbitration

22   was obviously filed first.  That should be used to resolve the

23   conflict.  We cited a number of cases in our opening brief on

24   that point, and we would point your Honor to all of those where

25   the first-filed doctrine has been applied to resolve a

P2CRSPIo

1    conflict.

2              And finally, your Honor, if your Honor can exercise

3    your discretion to implement a stay here.  There are many

4    reasons why a stay would make sense here.  It would avoid

5    undermining the authority of the tribunal that has already been

6    put in place and has been looking at this matter very closely

7    and is prepared to go forward with a conference next week.  It

8    would minimize the risk of inconsistent results and contractual

9    permutations, conserve this Court's resources, the parties'

10   resources, promote judicial economy.  In that regard, your

11   Honor, we would point to your Honor's decision in *Garnes v.*

12   *Pritchard Industries.*  That's 2023 WL 3980693.

13             THE COURT:  I know it well.  Trust me.

14             MS. SIMSON:  Yes.  In that case, your Honor, you

15   invoked discretion the right to stay in that case.  We think

16   all the same reasons apply when you are balancing the factors

17   of avoiding piecemeal litigation where there's significant

18   overlap, which we think exists here, your Honor.

19             THE COURT:  Thank you very much, Ms. Simson.

20   Mr. Morgan?

21             MR. MORGAN:  Good morning, your Honor.  Brian Morgan

22   from Faegre Drinker.  Just a bit of housekeeping at the top,

23   your Honor.  I'm joined by Josh Lattimore, who has helped out

24   considerably with this case, and with the Court's permission,

25   he will address the alternative arguments.

P2CRSPIo

```
 1              THE COURT:  Sure, of course.
 2              MR. MORGAN:  To answer the first question, your Honor
 3    asked NorthStar's counsel whether there's any conflict or risk
 4    of inconsistent decisions with respect to the question of
 5    arbitrability of the dispute under the note, the Supreme Court
 6    addressed this issue in Coinbase——that's 602 U.S. 143——just
 7    last year, and said that if there's one contract that contains
 8    as an arbitration clause with the delegation provision, that
 9    should be decided in the first instance by the arbitral
10    tribunal.  But where there's two contracts, one sending
11    arbitrability disputes to arbitration and the other either
12    explicitly or implicitly sending arbitrability disputes to the
13    courts, a court Must decide which contract governs.  So we
14    submit that this dispute is properly before your Honor.
15              I'd also like to start with the note and talk about
16    exactly what's going on in section 15.  So as your Honor noted,
17    you know, the note was entered into subsequent or nearly a year
18    and a half after the framework agreement.  The parties were
19    certainly well aware of the framework agreement and the
20    arbitration clause as contained therein.  They chose not to
21    invoke it, incorporate it by reference, copy and paste it.
22    Instead they drafted a separate, and we think certainly not
23    complementary, forum selection provision that provides for a
24    different mechanism to resolve disputes.
25              THE COURT:  Sure.  But as the forum selection clause
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P2CRSPIo

1    in the promissory note is drafted, the only party that

2    irrevocably and unconditionally agreed not to commence any

3    litigation about the promissory note anywhere other than a New

4    York court was only NorthStar.  The parties could have written

5    that sentence beginning with "the parties agree."  Instead it

6    was only written to impose an obligation on NorthStar.  So why

7    shouldn't I draw an inference from that that it's not as broad

8    as you contend it is?

9            MR. MORGAN:  Sure.  Well, two reasons, your Honor.

10   That clause in that sentence ends with a comma, and then

11   there's a second part of the sentence that begins with "and," a

12   conjunctive term.  "Each of the parties hereto irrevocably and

13   unconditionally submits to the jurisdiction of this court."

14           THE COURT:  Right, but that's a consent to

15   jurisdiction clause.  That's not a forum selection provision.

16   Those two things are different.

17           MR. MORGAN:  And then, within the same section, your

18   Honor, further down, there's a discussion for the laying of

19   venue and providing that the borrower is irrevocably and

20   unconditionally waiving, to the fullest extent permitted by

21   applicable law, any objection that may now or hereafter have to

22   the laying of the venue of any action or proceeding arising out

23   of or relating to this note in any court reference in this

24   paragraph.  That contemplates an action brought by Spire,

25   otherwise they are certainly not going to object to their own

P2CRSPIo

| 1 | venue selection.  So the clause recognizes that there are going

| 2 | to be potential for claims brought under the note in New York

| 3 | courts to which the parties have agreed to have exclusive

| 4 | jurisdiction and that NorthStar is not going to object to venue

| 5 | or raise any inconvenient forum objection.

| 6 | THE COURT:  So you're saying basically they waived the

| 7 | whole motion that they brought here.

| 8 | MR. MORGAN:  We didn't make a waiver argument in the

| 9 | papers, your Honor --

| 10 | THE COURT:  Okay.

| 11 | MR. MORGAN:  -- but my point is that that language --

| 12 | you can't really reconcile that with a finding that this clause

| 13 | only applies to NorthStar and not Spire.  If NorthStar is

| 14 | waiving objections to the laying of venue or inconvenient

| 15 | forum, they are waiving objections to those types of arguments

| 16 | in an action brought by Spire.

| 17 | THE COURT:  Okay.

| 18 | MR. MORGAN:  And we submit that the language that is

| 19 | contained in this clause is similar to that considered by the

| 20 | Second Circuit in the *Applied Energetics* case.  You know, in

| 21 | *Applied Energetics*, the Second Circuit rejected a very similar

| 22 | argument to the one defendants are making here, which is that,

| 23 | oh, these clauses are complementary, and they can be read to

| 24 | only apply to a subsequent action to confirm or vacate an

| 25 | arbitral award.  In that case, the Court said no.  The language

P2CRSPIo

1    in that action, that providing that actions arising under the

2    agreement shall be brought in New York courts should be in

3    direct conflict with language in the arbitration agreement and

4    didn't require that court to send that dispute to arbitration.

5        In that respect, it's distinguishable from *Bank*

6    *Julius*, another case relied on by the defendants, where you had

7    a very broad arbitration clause that didn't only send disputes

8    arising under the underlying agreement to arbitration, but any

9    unresolved dispute, controversy, or claim arising out of or

10   relating to the business relationship between the parties, so

11   contemplating something broader than just the agreement itself.

12   And then, the subsequent forum selection clause was not

13   exclusive.  It began with some qualifying language that said,

14   "Without limiting the right of the plaintiffs to bring any

15   action or proceeding against the defendant in the courts of

16   other jurisdictions, parties consent to jurisdiction in New

17   York."

18       So that's not the language that we have.  This clause

19   doesn't contemplate suits being brought elsewhere, and in the

20   event they are brought in New York, both parties agree to

21   jurisdiction.  It contemplates actions brought by NorthStar or

22   Spire under the note to be venued in New York.

23       Opposing counsel mentioned *Offshore*.  *Offshore* is

24   similar to *Bank Julius*.  There the Second Circuit found that

25   the forum selection language in an engagement agreement did not

P2CRSPIo

1  expressly carve out disputes from a stock purchase agreement

2  that contained an arbitration provision.  There is language in

3  that case that expressly says that a forum selection clause

4  does not need to mention arbitration.  You can still supersede

5  the prior agreement to arbitrate without expressly referring to

6  the preclusion of arbitration.

7          And you know, it's important to note that in the

8  underlying SDNY decision, Second Circuit affirmed, that court

9  expressly recognized that there are disputes under this

10  agreement that could go to arbitration -- or that could go to

11  litigation.  They would just have to be ones that solely

12  involved the escrow agreement and don't invoke the stock

13  purchase agreement, which contained the arbitration clause.  We

14  submit that that is the nature of dispute between the courts --

15  or between the parties.

16          THE COURT:  Right.  But you wisely concede, I guess

17  let me put it that way, that the promissory note and the

18  framework agreement are certainly interrelated; the obligations

19  that NorthStar was undertaking in the promissory note wouldn't

20  exist absent the framework agreement.  So why isn't that

21  dispositive of the arbitrability question?

22          MR. MORGAN:  Because you do not need to decide any

23  obligations under the framework agreement in order to rule on

24  the discrete issue of whether NorthStar failed to live up to

25  its repayment obligation under the note.  You're right that the

P2CRSPIo

1    parties' relationship has its genesis in the framework

2    agreement.  But a year and a half later, this issue arose where

3    NorthStar was unable to pay the increased cost of the launch

4    service provider.  We agreed to be responsible for those costs.

5    We've submitted the testimony of the NorthStar's CEO in the

6    Canadian court hearing on the interim injunction, which he

7    explained how the note came to be and that NorthStar came to be

8    responsible for those costs.

9            The parties entered into a separate agreement that

10    solely governed that application.  You won't find something in

11    the framework agreement talking about this because it wasn't

12    contemplated.  If it was, you wouldn't need a note.  It would

13    be an issue that was resolved under the agreement.  Spire is

14    responsible for these costs or NorthStar is.  They entered into

15    a new separate agreement, and we submit a separate

16    relationship.  It doesn't mean the previous one ceased to

17    exist.  They continued to be customer and vendor, but now you

18    also have this borrower and lender relationship.

19            And the courts recognized that parties can enter into

20    multiple agreements governing different aspects of their

21    relationship, and all the contractual language in one isn't

22    necessarily imputed to the other.  You'll see that in the *Lewis*

23    *v. New Jersey Sports Production* case.  It's a case from the

24    Southern District in 2003.  It involved a boxer who entered

25    into several agreements governing the promotion of boxing

P2CRSPIo

1    matches.  One had an arbitration clause.  One didn't.  The

2    agreement with the arbitration clause expressly referenced the

3    other agreement and acknowledged the parties' obligations under

4    it.  But because the incident dispute before the Court was

5    under the first agreement that didn't contain the arbitration

6    clause, the court didn't find that the dispute had to be sent

7    to arbitration.

8              THE COURT:  Sure.  But NorthStar's arguments, if I

9    understand it, or at least some of the arguments why it hasn't

10   paid what it was supposed to pay under the promissory note, is

11   that Spire has breached its obligations under the framework

12   agreement, and that NorthStar only had obligations to pay what

13   is owed under the promissory note if Spire continued to act the

14   way it was supposed to act under the framework agreement.  So

15   I'm struggling with how do I take those, or the

16   panel—fortunately, I won't have to do that—will resolve one

17   issue without resolving the other.

18             MR. MORGAN:  I agree that NorthStar has improperly

19   raised this issue in the arbitration, and that is something

20   that Spire has pointed out.  We don't actually have a

21   counterclaim for breach of the note because our position is

22   that we didn't.

23             THE COURT:  I would imagine you wouldn't do that.

24             MR. MORGAN:  Either for nonpayment or for disregarding

25   the forum selection clause.  We pointed out here to the

P2CRSPIo

1    arbitral tribunal that we don't believe they have jurisdiction

2    over that particular dispute.  But this Court can certainly

3    decide the parties' obligations under the note.  Was there a

4    payment obligation?  Was it satisfied or not?

5           THE COURT:  So let's just say that the arbitration

6    panel decides that Spire was in breach of its obligations under

7    the framework agreement such that NorthStar had no obligations

8    to make any further payments with respect to any services that

9    Spire was due to provide, including what's contemplated by the

10   promissory note.  How wouldn't that resolve their payment

11   obligations and the case in this court involving the promissory

12   note?

13          MR. MORGAN:  Well, I don't think they could factually

14   make that finding——and opposing counsel may correct me——but I'm

15   not sure that that's quite their argument.  The amounts covered

16   by the note were paid.  They went to a third party for the

17   launch of rockets.  They went up in the air.  This is not

18   ongoing services that Spire is providing in connection with

19   these payments.  They've been provided by this third party.  If

20   Spire is found to have been in breach of the agreement, and

21   they owe NorthStar money, which we don't believe is factual, of

22   course.

23          But accepting the Court's premise, then they may have

24   an argument for offset, or just as a practical matter, there

25   will be offset that we could prevail here on the $4.5 million

P2CRSPIo

1    plus interest.  They could prevail in Canada on the principal

2    amount they're seeking.  But I don't think there's any argument

3    that because of any dispute over ongoing services, the amount

4    under the note is simply that you owe us more than we owe you.

5          THE COURT:  Okay.  Thank you.

6          Could you address some of the points that Ms. Simson

7    was making about the language and the way the forum selection

8    clause and the note is drafted?  She's essentially arguing that

9    there's nothing in the forum selection clause in the promissory

10   note that precludes or revokes the arbitration clause.  And so,

11   that's the thing that opens the door to arbitrating any issues

12   about the promissory note as well.

13         MR. MORGAN:  Sure.  Just as an initial matter, it

14   doesn't have to mention arbitration.  That's what the Second

15   Circuit said in *Offshore*.  You can revoke --

16         THE COURT:  Sure.  But there's nothing here that sort

17   of -- what is the language in the forum selection clause that

18   you think precludes or revokes the right to arbitrate?

19         MR. MORGAN:  Well, I think if you -- so the Supreme

20   Court in *Granite Rock* says the starting principle for whether

21   something is arbitral or not is not rather the presumption of

22   arbitrability but rather whether the parties have agreed to

23   arbitrate this particular dispute.  And it says that lower

24   courts may have gone too far in the presumption of the

25   arbitrability direction while disregarding this first

P2CRSPIo

1    principle.

2            But I think if you look at the framework agreement as

3    an initial matter, what if the parties agree to arbitrate in

4    there, and its disputes or claims arising out of or in

5    connection with the agreement or its subject matter or

6    formation.  We're not alleging that they breached the framework

7    agreement with respect to the repayment obligation.  We're not

8    contesting the formation of the contract.

9            The claim is narrow.  It's under the note that you

10   executed a year and a half later, which you promised to pay us

11   $4.5 million on October 20, 2024.  You haven't done so, and

12   you've breached that.  So I think just on its face, it's beyond

13   the scope of the arbitration agreement.  And then, you have the

14   forum selection clause that is actually contained in the note

15   that has all these provisions about any disputes in the note

16   being governed by New York law, need to be brought in the New

17   York courts, the parties consent to exclusive jurisdiction and

18   waive any objection to venue.  So I think taken together, you

19   can make the finding that, yes, there's an arbitration clause

20   in the framework agreement.  But it does not necessarily cover

21   this particular dispute under the note, and that the resolution

22   of this dispute would not have required the interpretation of

23   any issues under the framework agreement.

24           You can resolve this discrete dispute without

25   consulting in the framework agreement.  You can resolve the

P2CRSPIo

1    dispute on framework agreement, obviously, pursuant to its

2    terms.

3            THE COURT:  Okay.  Just the mechanics of the

4    promissory note are so Spire has actually paid; I guess it's

5    Rocket Lab that was the launch provider that was contemplated.

6    So Spire paid Rocket Lab?  Or did NorthStar pay Rocket Lab?  Or

7    nobody paid?

8            MR. MORGAN:  Your Honor, I don't know if we gave the

9    money to NorthStar or the third party gave it to them.

10           THE COURT:  But rocket Lab has been paid?

11           MR. MORGAN:  Yes.

12           THE COURT:  So it's a question as between NorthStar

13   and Spire who should have to foot the bill for that.

14           MR. MORGAN:  The bill has been paid.

15           THE COURT:  Right.  Who is stuck?

16           MR. MORGAN:  Do you have to pay it back as you agreed

17   to do, or is there some equitable or other --

18           THE COURT:  Right.  Thank you.

19           What about the fact I was discussing with Ms. Simson,

20   the ICC rules contemplate the arbitrability question is it

21   supposed to be -- certainly that the panel has the ability and

22   is empowered to decide that issue.  So why shouldn't I infer

23   from the fact that the parties chose the ICC rules to defer to

24   letting the panel decide that issue?

25           MR. MORGAN:  Sure, your Honor.  I think that's

P2CRSPIo

1   addressed in Coinbase, the Supreme Court decision I referenced

2   earlier.  When there's two contracts, the first one has an

3   arbitration clause; the second doesn't have an arbitration

4   contract, the Supreme Court said the question of arbitrability

5   under the second contract should be decided by the courts, not

6   under the delegation provision in the initial arbitration

7   clause.

8           THE COURT:  Thank you.

9           MR. MORGAN:  Just briefly, your Honor, touching on

10  some of the other arguments that were raised by NorthStar, the

11  lack of a merger clause is not dispositive.  The purpose of a

12  merger clause is to protect the parties against a claim that

13  there's some other writing that forms part of their agreement.

14  It does not indicate how the provisions of various documents

15  should relate to one another.  That's discussed in the *Rosen v.*

16  *Mega Blocks* decision we cite.

17          THE COURT:  Sure.  But the parties, if there were a

18  merger clause, that would have been even more evidence on your

19  side that there was an intent to preclude arbitration, right?

20  And so, shouldn't I infer from the absence of a merger clause

21  that it's more evidence that the parties were not intending to

22  preclude the arbitration provision?

23          MR. MORGAN:  No, your Honor.  I think what *Offshore*

24  says is that you do not need language expressly superseding the

25  prior agreement contained in the arbitration clause to find

P2CRSPIo

```
1    that the subsequently executed agreement has in fact had that.

2            THE COURT:  Right.  But the merger clause would not

3    have to necessarily reference arbitration.  It would just say

4    it's standard, you know, the boilerplate merger clause

5    language.

6            MR. MORGAN:  There's reaffirmation and a confirmation

7    provision of the agreement, which references the earlier

8    executed framework agreement, and it's careful in what it does.

9     It essentially says that except for something that may be

10   agreed herein, that agreement is still valid, and then provides

11   that NorthStar has separate obligations of the framework

12   agreement and that the note is not absolving NorthStar of any

13   other payment obligations.

14           So the framework agreement was on parties' mind, of

15   course, when they drafted this document.  And the fact that

16   they went to the effort of drafting a forum selection clause

17   that's twice as long as the arbitration clause suggests that

18   they had different intentions with respect to how disputes that

19   arise in the agreement should be adjudicated.  I don't think

20   that you can find that this dispute has to be submitted to

21   arbitration without disregarding various provisions of that

22   language which are contrary to well-established principles of

23   contract adjudication.

24           THE COURT:  I'm just mindful of the time.  I have

25   another proceeding at 1:00, and I want to give your colleague a
```

P2CRSPIo

|     |                                                                      |
|-----|----------------------------------------------------------------------|
| 1   | chance to speak.  And then I want to give Ms. Simson a brief          |
| 2   | chance to respond.  Go ahead.                                         |
| 3   | MR. LATTIMORE:  Thank you, your Honor.  I'll start                    |
| 4   | with the first-filed rule.  Our position is that this rule           |
| 5   | doesn't apply.  This rule applies and gives deference to a            |
| 6   | first-filed case where the issues and the parties are                |
| 7   | overlapping and identical.  Here, as we've just pointed out,          |
| 8   | the dispute under the note of who has to -- or whether                |
| 9   | NorthStar has to repay this amount that has been put out is           |
| 10  | entirely separate from the issues of the parties' obligations        |
| 11  | under the framework agreement and what's being settled in the        |
| 12  | ICC arbitration.  And so, there's no risk of inconsistent            |
| 13  | results.                                                             |
| 14  | For very similar reasons, the Court should not                       |
| 15  | exercise its discretion to stay the case.  NorthStar mentioned       |
| 16  | a moment ago that the discretionary stay would serve to avoid        |
| 17  | undermining the authority of the ICC arbitration.  It has been       |
| 18  | Spire's position that the note is not at issue in the ICC            |
| 19  | arbitration, that the ICC panel has no jurisdiction over that        |
| 20  | note.  They pointed out that it would avoid reaching                 |
| 21  | inconsistent results.  Here, again, that arbitral panel is not       |
| 22  | going to decide the narrow issue of whether NorthStar has to         |
| 23  | repay this amount, and neither does this Court has to decide         |
| 24  | what the parties' rights and obligations are and whether those       |
| 25  | was a breach of the framework agreement in order to determine        |

P2CRSPIo

1    that NorthStar has repay the amounts due under this note.

2            And for those similar reasons, it would not serve for

3    judicial economy.  The ICC arbitration, according to Spire's

4    Canadian counsel, Thomas Yates, is expected to take at least 12

5    months but more likely something as long as 18 months.  We have

6    pointed out -- sorry.  Counsel has pointed out that the

7    arbitral panel has been impaneled, and that there's a status

8    conference this upcoming February 21.  And if there is a motion

9    or a request to expedite the arbitration, I would point out

10   there that the request for expedited arbitration is not for the

11   entire arbitration.  It is for the claims made by NorthStar in

12   the arbitration.  It would only be after that issue is decided

13   that the rest of the arbitration would proceed.

14           From that point, there would be an exchange of briefs,

15   potential dispositive motions.  And then, only then would it

16   proceed to a hearing.  Assuming there's an award, that award

17   would need to be confirmed.  And there's no reason that in the

18   meantime this Court cannot rule on the narrow issue of whether

19   NorthStar has to repay the amounts due under the note.

20           THE COURT:  Okay.  I realize that your initial filing

21   was in state court under the unique civil procedure rule that

22   the New York courts have with a motion for summary judgment in

23   the complaint.  So there's no trial or anything contemplated

24   occurring here.  If the promissory note dispute were to solely

25   proceed here, it would just be motion practice and a decision

P2CRSPIo

1    by this Court?  Or is there discovery that's contemplated or

2    any other court proceedings?

3              MR. LATTIMORE:  I understand that if the motion

4    proceeds here, the motion would serve as our complaint, and

5    then they would get a chance to answer.  There could be

6    discovery and, you know, hearings here in this court.

7              MR. MORGAN:  Just to clarify, your Honor, I believe

8    that's only if the motion is denied.  So if the motion is

9    granted, case over, summary judgment.  So if the motion is

10   denied, then pleadings turned into the complaint.

11             THE COURT:  Right.  And I didn't check if these were

12   jury trial.  Did you check the box for a jury trial here?

13             MR. MORGAN:  We did not.

14             THE COURT:  Thank you.  Anything further,

15   Mr. Lattimore?

16             MR. LATTIMORE:  Nothing further, your Honor.

17             THE COURT:  Thank you.

18             Ms. Simson?

19             MS. SIMSON:  So the first thing I want to address,

20   your Honor——and being mindful of time, I'm going to try to be

21   efficient——they said that you don't need to decide anything in

22   the framework agreement in order to decide this current issue.

23   I wanted to point out that their summary judgment motion in

24   lieu of, paragraph 21, asks for $630,000 in interest in

25   addition to the principal and various other forms of relief.

P2CRSPIo

1    If you're actually looking at the face of the note, in the

2    preamble, right at the end, it says, "Interest on this note

3    shall accrue daily from the payable date of the invoice to

4    which the principal amount funded under this relates pursuant

5    to the terms of the Spire agreement as defined below."  The

6    Spire agreement is then defined to be the framework agreement

7    that we were talking about.  So their demand for interest set

8    forth in the summary judgment motion in lieu of complaint

9    directly requires interpreting the framework agreement.  So the

10   notion that you don't even need to look to the framework

11   agreement to resolve this dispute is belied by their own

12   pleading.

13           Turning to what your Honor just asked about whether or

14   not there would be any discovery in this case, we have not yet

15   responded to the summary judgment motion in lieu of complaint,

16   but you bet if we ever have to, we'll be opposing it.  That

17   would, you know, draw out the proceedings.  And I think going

18   back to what I said earlier about efficiency and inconsistent

19   rulings and all of that, you can see a scenario where that

20   would devolve into claims and counterclaims and arguments

21   against the parties that parallel exactly what is going on in

22   the ICC arbitration as far as breach and demands for payment.

23           The *Applied Energetics* case that opposing counsel

24   mentioned, we distinguished that case on page 22 our opening

25   motion.  So I won't repeat myself there, but I would just

P2CRSPIo

1    direct your Honor to that discussion.

2            As far as opposing counsel suggested that this is just

3    a $4.5 million repayment, and I don't think that's an accurate

4    characterization of what the note actually says.  The note

5    says――again in the preamble, important paragraph in this

6    document――"This note has been issued for business purposes, and

7    evidences our deposit for services to be rendered by the holder

8    under the Spire agreement."  It's NorthStar's position that the

9    services to be rendered by the holder under the agreement have

10   certainly not been performed as the party agreed.

11           Had NorthStar known that Spire was not going to

12   replace the satellites within the agreed upon 11 months set

13   forth in the framework agreement, was not going to carry out

14   the duties to maintain and operate the satellites that are in

15   block failure at the moment, all of that, it would not have

16   agreed to this note, right.  So, I think you have to look at

17   the two documents that are inextricably intertwined and try to

18   parse them out the way opposing counsel is doing.  It's belied

19   by the face of the document.

20           With respect to your Honor's question about the

21   absence of the merger clause, we think that's important mostly

22   because if they wanted to override the mandatory arbitration

23   clause, that is very broad in scope, that is set forth in the

24   framework agreement, they could have written paragraph 15 of

25   the note much differently, and the fact that they did not is

P2CRSPIo

1    telling.  Again, as I said earlier today, it allows section 15

2    of the note to be viewed in a complementary manner for the

3    reasons I've previously described allowing for forum for

4    litigation brought by NorthStar in circumstances for topics

5    that are outside the scope of the framework agreement and

6    subject matter, like what I mentioned today and the arbitration

7    award and the like.

8            Finally, just to address the last couple of comments

9    made by opposing counsel, the first-filed rule is well suited

10   to break the standoff between parties as to how to proceed

11   here.  And opposing counsel suggested that the subject matter

12   between the two cases needs to be identical.  That is not the

13   standard.  The standard is touches matters, and we point your

14   Honor to our discussion on that precise argument that was set

15   forth in our reply brief.  And with respect to the request to

16   expedite for claims made by NorthStar, certainly if there was a

17   resolution in that favor, that would allow for an offset of

18   this $4.5 million payment that they are requesting here today,

19   your Honor.

20           THE COURT:  Okay.  Thank you.

21           All right.  Thank you very much.  These arguments have

22   been very helpful.  We will ask the parties to order a copy of

23   the transcript of the argument on an expedited basis so that we

24   can get a decision out on the motion to you as soon as

25   possible.  We understand the urgency to this and are well on

P2CRSPIo

1    our way to having a decision for you, and we'll need the

2    transcript though to be able to complete that.

3            If there's nothing else on the motion, I'd like to go

4    off the record and ask counsel some other questions.  Anything

5    further from the plaintiff today though?

6            MR. MORGAN:  No.  Thank you, your Honor.

7            THE COURT:  From the defendant?

8            MS. SIMSON:  Your Honor, just a quick procedural

9    question with respect to the transcript request.  Would you

10   like us to email it to your email address?

11           THE COURT:  No.  There's a form that my deputy can

12   point you to after that this gives you all the instructions

13   about where to submit it.  It goes directly to the court

14   reporters.

15           MS. SIMSON:  Thank you.

16           THE COURT:  We'll officially be adjourned on the

17   motion proceeding today, and we'll go off the record.  Thank

18   you.

19           (Adjourned)

20                                 o0o

21

22

23

24

25